IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| John Richard Osterberg,<br><br>      Plaintiff,<br><br>  v.<br><br>Sarah Meyers, Marcia Sanders, Gretchen Johnson, Valerie Lewis, Connie Wells, and Jane Does I-V,<br><br>      Defendants. | Case No. 3:18-cv-50082<br><br>Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Richard Osterberg brings this action under 42 U.S.C. § 1983 for alleged violations of his right to constitutionally adequate medical care under the Fourteenth Amendment. As Defendants, he names several nurses at the Winnebago County Jail in Rockford, Illinois, where he was a pretrial detainee. Before the Court is Defendants motion for summary judgment. For the reasons explained in detail below, that motion [115] is granted.

**I.    Background**

In June 2017, Plaintiff John Osterberg suffered a serious injury to his right ankle, which was treated at SwedishAmerican Hospital Center-Belvidere. As a result of the injury, Osterberg underwent a surgical procedure, wherein surgical screws, a lock, and a plate were inserted into his ankle. After the surgery, he was prescribed a walking boot and a pain medication commonly known as Norco. Neither the pain medication nor the walking boot were intended to be long-term

1

prescriptions, however. On August 24, 2017, Osterberg requested a refill of Norco. The refill was granted but he was told it would be the final refill. Medical records dated September 20, 2017, note that the Norco pain medication had, at that point, been discontinued. Those same records indicate that Osterberg was transitioned out of the walking boot (known as a controlled ankle movement, or CAM Boot) on his right ankle and was instead given an ASO Brace, which is similar to an ankle wrap with Velcro straps.

On October 20, 2017, Osterberg was detained at the Winnebago County Jail as a pretrial detainee. After his conviction, Osterberg was transferred to the Illinois Department of Corrections on September 19, 2018, to begin serving his sentence. The basis for this action is Osterberg's contention that, during his pretrial detention at the Winnebago County Jail, he received constitutionally inadequate medical care. The Jail's medical services are provided by the University of Illinois College of Medicine in Rockford, Illinois. Defendants Valerie Lewis, Connie Wells, Sarah Meyers, Marcia Sanders, and Gretchen Johnson were all nurses working at the Jail during the relevant time.

On October 21, 2017, the day after Osterberg began his pretrial detention, he filed a medical request complaining about pain in his back and ankle. Two days later, on October 23, 2017, Nurse Johnson examined Osterberg, who reported pain in his ankle rating as an eight out of ten. Nurse Johnson did not believe the pain was unusual and did not warrant a doctor visit; given the recency of Osterberg's surgery, some pain would be expected. So, she prescribed him Tylenol, instructed

him to take cool showers and drink plenty of fluids, and told him to return if the pain persisted. She also noted that he was undergoing outside physical therapy to rehabilitate the ankle. Dkt. 116-6, at 5; Dkt. 116-12, ¶¶ 6–7. The decision to offer Osterberg Tylenol to treat his pain was done according to standing medical provider orders for pain. Dkt. 124, ¶ 15.

A day later, on October 24, 2017, Osterberg filed a medical grievance complaining about pain and asking for his ankle brace. In response, the medical staff seemed confused. Osterberg had not been wearing the walking boot during intake at the Jail. Instead, he was wearing the ASO ankle brace. In response to the medical staff's apparent confusion, Osterberg confirmed on October 24 that he was referring to a brace prescribed by Doctor Jeffery Earhart, the surgeon who had performed his ankle surgery. Four days later, Nurse Connie Wells entered a response to Osterberg's answer thanking him for the information. That same day, Osterberg was given the ASO brace, Dkt. 116-14, ¶ 10, though the decision to return the brace may have been made by corrections staff.

Independent of Osterberg's interaction with Nurse Wells, he filed a medical grievance on October 27, the day before he was given his brace. In that grievance, he again asked to be given his brace because he was experiencing pain and swelling. Nurse Lewis responded that he should fill out a medical request instead. Nurse Lewis responded in this way because a medical request and a grievance are different. The medical request is used to ask for treatment, and so they are responded to more quickly.

3

On October 28, 2017, the same day Osterberg was given the ASO brace back, he fell out of his bunk and was sent to SwedishAmerican Hospital as a result. Osterberg believed he fell because he didn't have the brace to stabilize his ankle. At the hospital, he was examined by Doctor Daniel Eggeman, who ordered labs, spine and ankle x-rays, a brain CT, and an EKG. Dr. Eggeman then discharged Osterberg back to the Jail without ordering any pain medication, orthopedic treatment, or physical therapy. He did, however, note that Osterberg should follow up with a provider within one to two days.

On November 21, 2017, Osterberg filed another medical request complaining about back pain and numbness in his right leg. The next day, Nurse Sarah Meyers examined him.[1] He again reported pain at a level of eight out of ten, but showed no swelling, deformity, discoloration, limited range of motion, or other objective signs of pain. As a result of this examination, Nurse Meyers ordered Osterberg 400 milligrams of ibuprofen, which she did pursuant to standing medical provider orders. Meyers noted that she was able to assess Osterberg's range of motion by observing him walking around the pod. She had witnessed him walking frequently during medical pass and had never seen him exhibit any signs of pain or limping. She testified, "I remember him being a walker," and shortly thereafter that "I never recall seeing him limp ever." Dkt. 116-11, at 78. Furthermore, she observed that his blood pressure was normal, which she found odd because extreme pain would

---

[1] Osterberg notes that no one ever responded to his November 21, 2017, medical request. But regardless of whether anyone entered a written response in the system, he was examined by Nurse Meyers the next day.

4

typically cause an elevated blood pressure. *Id.* at 75. From this, Meyers did not believe Osterberg's report of severe pain was consistent with the objective evidence. Nor did Meyers believe Osterberg needed further evaluation from a physician.[2] *Id.* at 75, 79.

On February 7, 2018, Osterberg filed a medical grievance. He explained that he was still experiencing pain after his fall. He also referred to what he called "a burning sensational pain going down my right leg." Dkt. 116-6, at 25. In the grievance, he further noted that although he had seen the nursing staff, he wanted to be examined by a physician. *Id.* In response to the grievance, Nurse Marcia Sanders examined Osterberg on February 12, 2018. During the examination, Nurse Sanders noted that Osterberg complained of right leg numbness and tingling if he sat or laid down too long. She also noted that Osterberg denied being in pain during the examination, though he had reported being in pain when he filled out the medical grievance that led to the examination. *Compare* Dkt. 116-10, at 88, *with* Dkt. 116-6, at 22. Nevertheless, the parties agree that "[i]ntermittent leg numbness and tingling is not unusual for a man Mr. Osterberg's age, and alone is not an emergent or urgent condition." Dkt. 124, ¶ 33. Nurse Sanders then checked Osterberg's vitals, which were all normal. Based on those normal vital signs, she concluded that Osterberg was not in any severe pain or distress, was not suffering

---

[2] Osterberg was scheduled to see an orthopedic doctor on November 22, 2017. The nursing staff cancelled that visit, however, because Osterberg had a court date that conflicted with the orthopedic visit. For reasons not made clear by the evidence, the visit was not rescheduled.

from an emergent condition, and did not require a referral to a physician or nurse practitioner.

Two days after the examination by Nurse Sanders, on February 14, 2018, Osterberg filed another medical grievance asking to see a physician. Nurse Sanders responded on February 16, 2018. She asked him generally what problem he was experiencing so she would know how to handle the grievance. The same day that Nurse Sanders responded to Osterberg, he filed another grievance complaining about back pain radiating down his right leg. Two days later, on February 18, 2018, Nurse Meyers examined Osterberg in response to the February 16 grievance. During the examination, Osterberg explained that walking helped alleviate the pain from his back. He further explained, however, that his back pain had reached a ten out of ten level of pain, though he did not report any pain in his ankle. Nevertheless, Nurse Meyers did not see any obvious signs of distress in his movement. He didn't appear to have difficulty walking, and he showed no signs of swelling, redness, or bruising. He again had normal vital signs, which Nurse Meyers saw as inconsistent with someone experiencing extreme pain. Thus, Nurse Meyers offered him additional ibuprofen for another three days. In response, Osterberg was significantly unhappy. He became unruly and raised his voice enough that a correctional officer stood next to Nurse Meyers just in case. Osterberg then refused the ibuprofen and demanded to see a doctor. Based on this response,

6

Nurse Meyers sent Osterberg's chart to Nurse Practitioner Tricia Corrigan for an additional review.[3]

On February 20, 2018, two days after Osterberg became upset with Nurse Meyers, Nurse Practitioner Corrigan reviewed Osterberg's records and asked that he be placed on her clinic list because he had been asking to see a provider.[4] Nevertheless, Corrigan did not believe, based on her review of his records, that Osterberg was at risk from any serious medical issues. As a nurse practitioner, Corrigan is able to prescribe medication, order physical therapy, refer patients to specialists, and recommend assistive devices if those treatment options are warranted. Dkt. 116-5, ¶ 3. For reasons not explained by the evidence, Osterberg was not seen by Nurse Practitioner Corrigan until September even though Nurse Sherry White initialed next to Corrigan's order. Osterberg was originally scheduled to see Corrigan on September 10, 2018, but Osterberg had a conflict on that day and instead saw Corrigan on September 11, 2018. *Id.* ¶¶ 19. Notwithstanding the delay in scheduling Osterberg for a clinical visit with Corrigan, he didn't file any more complaints about his back, leg, or ankle during the interim time.

At the September 11, 2018, examination, Osterberg reported chronic lower back and right leg pain, as well as chronic numbness and tingling in the right

---

[3] Although nurse practitioners are not medical doctors, they have "at least a master's degree in nursing and advanced education in the primary care of particular groups of clients." They are thus "capable of independent practice in a variety of settings." *Nurse Practitioner*, Stedman's Medical Dictionary (28th ed. 2006). Furthermore, the term "provider" includes nurse practitioners. *Provider*, Stedman's Medical Dictionary (28th ed. 2006) ("A term used by managed care organizations, referring to anyone rendering medical care, including physicians, nurse practitioners, physician assistants, and others.").
[4] Nurse Practitioner Tricia Corrigan is not a defendant in this action.

lateral foot. Although his range of motion was normal in his left foot, it was more limited in his right foot, and he experienced some pain in his range of motion. He further presented with normal vitals, including no deformity, swelling, or discoloration and a steady gait. Corrigan prescribed Naproxen for fourteen days, referred him to physical therapy, and instructed him to continue using the brace. Nevertheless, based on her review of Osterberg's earlier records, Corrigan did not believe Osterberg's condition had deteriorated at all.

Notwithstanding the above timeline, Osterberg filed suit in this Court on March 5, 2018. Dkt. 1. After the Court recruited counsel to represent him, Osterberg's counsel filed the operative second-amended complaint on July 27, 2018. Dkt. 11.

## II. Analysis

On summary judgment, the movant has the burden of establishing that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Facts are material if they might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). No genuine dispute exists as to those material facts if the court would be required to grant a Rule 50 motion at trial. *Id.* at 250–51. In analyzing the evidence, the court must construe all facts and reasonable inferences in favor of the nonmoving party. *Rickher v. Home Depot, Inc.*, 525 F.3d 661, 664 (7th Cir. 2008). Furthermore, to establish a genuine dispute of a material fact, the nonmoving party must present more than a mere scintilla of evidence. *Johnson v. Advocate Health & Hosps. Corp.*,

892 F.3d 887, 894 (7th Cir. 2017). Indeed, even if some evidence favors the nonmovant, the court must grant the moving party's motion for summary judgment if no reasonable jury could find in favor of the nonmovant. *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013).

### a. Due Process—Objective Unreasonableness

Because Osterberg was a pretrial detainee during his time incarcerated at the Winnebago County Jail, his claim for constitutionally inadequate medical care arises under the Fourteenth Amendment, rather than the Eighth Amendment. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Under the Fourteenth Amendment, a plaintiff's claim of constitutionally inadequate medical care is subject only to the objective unreasonableness inquiry, rather than the Eighth Amendment's deliberate indifference test. *Id.* In other words, a pretrial detainee need not prove that the defendant was subjectively aware that her actions were unreasonable. *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018). Rather, the plaintiff must show that the defendant acted purposely, knowingly, or recklessly when they considered the consequences of their actions. *Id.* This means that the defendants must have been aware their actions would be harmful, or at least strongly suspect as much. *Pittman v. City of Madison*, 970 F.3d 823, 828 (7th Cir. 2020).

Next, the plaintiff must be able to establish that the defendant's conduct was objectively unreasonable—without regard to the defendant's subjective understanding. *Id.* As the Supreme Court noted in *Kingsley v. Hendrickson*, conduct

9

is objectively unreasonable when it "is not rationally related to a legitimate governmental objective or . . . is excessive in relation to that purpose." 576 U.S. 389, 398 (2015); *see also Hardeman v. Curran*, 933 F.3d 816, 827 (7th Cir. 2019) (Sykes, J., concurring). Furthermore, in determining whether the defendants' actions were objectively unreasonable, courts must consider the totality of the circumstances. *Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020).

Additionally, all plaintiffs bringing individual capacity suits under § 1983 must establish a causal connection between the defendant's personal actions and the harm complained of. *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) ("Individual liability pursuant to § 1983 'requires personal involvement in the alleged constitutional deprivation.'" (quoting *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017))). So, it is important to remain cognizant of the difference in roles between a nurse and a medical provider. As the Seventh Circuit recently reiterated, "a nurse can, and indeed must, defer to a treating physician's instructions," though they cannot be "blind or unthinking." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022). Though that case addressed a deliberate indifference claim under the Eighth Amendment, even under the Fourteenth Amendment, a plaintiff must be able to show that the nurse's conduct was more than merely negligent, or even grossly negligent. *McCann*, 909 F.3d at 886.

In *McCann*, the defendant nurse had administered the lethal dose of methadone that ultimately led to the pretrial detainee's death. Nevertheless, the

10

Seventh Circuit explained that the estate had not produced any evidence that she purposely, knowingly, or recklessly administered that lethal dose because she had done so in accordance with a doctor's orders. *Id.* at 886–87. Furthermore, the court held that the estate failed to produce evidence showing that her actions were objectively unreasonable. On the contrary, she relied on a physician to determine the proper dosage, and the totality of the circumstances showed that she diligently cared for McCann within the confines of her role as a nurse, including frequently checking his status, bandaging his wounds, serving him meals, and bathing him. *Id.* 887.

### b. Nurse Defendants

In Counts VI through X, Osterberg sues five individual nurses that were involved in some capacity in his care or his medical requests and grievances. None of the evidence in the record, however, is sufficient to establish the first element of the Fourteenth Amendment objective unreasonableness test against any of these nurses.[5] To begin, it is important to explain that the undisputed evidence shows that Osterberg's pain medication was discontinued before he arrived at the Winnebago County Jail. Osterberg attempted to dispute this in his response to Defendants' Local Rule 56.1 statement of facts, but the evidence he cited is the same evidence the Defendants cited. That evidence, the medical records, clearly lists the Norco pain medication (in its medical name) under the discontinued

---

[5] Osterberg's argument in response often assumes the standard is deliberate indifference. As the Court has explained, the standard under the Fourteenth Amendment is objective unreasonableness.

11

section. Dkt. 116-4, at 3. The records further explain that Osterberg was no longer on any pain medication, and that the walking boot was removed during that visit. Furthermore, the only medication that he was documented to be taking was a once daily aspirin. *Id.* So, shortly before he was detained at the Jail, his physician had determined that he no longer needed the Norco pain medication and instead had him take an over-the-counter medication similar to what Defendants offered him after his detention began.

Osterberg's argument furthermore lumps together the nurses, essentially assuming that if their actions as a whole violated the Constitution, then the nurses could all be held liable. But Osterberg must show how each Defendant was personally involved in any constitutional injury. *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010). Nevertheless, the objective unreasonable test analyzes the totality of the circumstances. *Mays*, 974 F.3d 820. But even assuming each nurse was aware of the interactions Osterberg had with every other nurse (for example, by reviewing his records), the evidence still fails to establish that any nurse was aware of, or strongly suspected, that their conduct would be harmful. *Pittman*, 970 F.3d at 828.

On the contrary, the evidence establishes that the nurses merely disbelieved Osterberg's complaints of pain because those complaints were simply not consistent with the objective medical evidence. He did not present with any outward indications of pain, and his vital signs, including his blood pressure, were not consistent with someone experiencing severe pain. Furthermore, their decisions to

12

prescribe ibuprofen were undisputedly done in accordance with medical provider standing orders. And nurses are entitled to defer to the professional judgments of medical providers unless such deference is done blindly and unthinkingly. *Reck*, 27 F.4th at 485. At bottom, Osterberg's contention is that he should have been referred to a medical provider sooner. But the nurses did not believe he needed to be referred to a provider, and nothing suggests they strongly suspected this declination would be harmful.

Regarding Nurse Meyers, Osterberg contends that she failed to refer him to a medical provider even though she didn't perform an examination. That contention is completely unsupported by any evidence in the record. On the contrary, the undisputed evidence establishes that she based her decision on objective medical evidence, including a normal blood pressure, which she expected would be high if Osterberg was suffering from severe pain. The same can be said of Nurse Sanders. Osterberg similarly did not outwardly present with any evidence of pain when he visited with Nurse Sanders. And Nurse Sanders eventually referred him to a medical provider in response to his suddenly becoming irate. That provider, Nurse Practitioner Corrigan didn't think Osterberg's issues were emergent, but nonetheless asked to examine him. Though that examination was inexplicably delayed, the evidence does not support the contention that the delay had anything to do with any Defendant. On the contrary, a nonparty nurse acknowledged Corrigan's order, and Corrigan herself is also not a party to this action.

13

The only evidence in the record regarding Nurse Johnson is that she interacted with him when he was first detained at the Jail. He reported pain in his ankle, but this did not seem unusual to her because of the recency of his surgery. So, she offered him Tylenol. That decision was done pursuant to standing provider orders, which she was entitled to defer to. Considering the totality of the circumstances, the Court notes that little time had passed since Osterberg had seen Dr. Earhart, who discontinued the pain medication and only offered him a very similar over the over-the-counter medication.

The only involvement Osterberg points to regarding Nurse Lewis is that she responded to a medical grievance by instructing him that he should instead file a medical request. Osterberg doesn't attempt to show that Nurse Lewis' response was wrong. Nor does Nurse Lewis appear to have ever been directly involved in Osterberg's medical care. There's simply no evidence that any of her actions were unreasonable or that she strongly suspected that any action she took would lead to a harmful result. There's even less evidence concerning Nurse Wells. Her only involvement was that she responded to one of Osterberg's medical grievances by asking for more information regarding the ASO brace. Osterberg then responded with the information of the prescribing doctor. Osterberg does not explain in any way how her actions were wrongful, other than summarily lumping her together with the other Defendants.

To be sure, stubbornly persisting with ineffective treatment, rather than seeking a referral can amount to constitutionally inadequate care. *Goodloe v. Sood*,

14

947 F.3d 1026, 1031 (7th Cir. 2020). But the evidence fails to establish that these Defendants doggedly pursued a course of treatment they knew wasn't working. On the contrary, the evidence merely establishes that some Defendants had no involvement and others simply did not believe Osterberg's reports of severe pain. They based their disbelief on his subjective reports of pain being inconsistent with the objective medical evidence. And even if that belief was ill-advised, Osterberg's constitutional claims require a showing beyond negligence. *McCann*, 909 F.3d at 886. Furthermore, their decisions to offer ibuprofen were undisputedly in line with standing medical provider orders to which they lawfully deferred. Because that deference was not done blindly, and instead was done consistent with their interpretation of the objective medical evidence, they are entitled to judgment as a matter of law. *Reck*, 27 F.4th at 485.

   c. **Jane Does I-V**

Defendants argue that the Court should grant summary judgment to Defendants Jane Doe I through V because, after the aid of discovery, Osterberg has failed to identify them. Defendants contend that the time has passed to add them to this suit, and even if an amendment were possible, any resulting claim against those Defendants would be time barred. Osterberg has not responded to this argument. Indeed, discovery has closed and Osterberg has had four years to identify the unnamed defendants. Furthermore, the statute of limitations for § 1983 actions in Illinois is two years. *Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016). Any new defendants at this point would have a clear statute of limitations defense.

Contrary to Defendants argument, however, the Seventh Circuit has explained that district courts should dismiss unnamed and unknown defendants in this situation, rather than granting summary judgment. *Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007) ("Due to Williams's failure to identify this defendant and the lack of any record that this individual was served with process, the district court's grant of summary judgment for this unknown and unnamed defendant is modified to dismiss this defendant from the case."). Thus, the Court dismisses Jane Does I-V from this case.

### d. Injunctive Relief

In the second-amended complaint, Osterberg seeks injunctive relief compelling Defendants to refer him to an outside specialist and to prescribe him stronger pain medication. Dkt. 11, ¶ 126. As Defendants note, Osterberg is no longer a pretrial detainee at the Winnebago County Jail. Indeed, he does not reside there at all. On September 19, 2018, he was transferred to the custody of the Illinois Department of Corrections to begin serving his sentence. Because Osterberg is no longer in the Jail's custody, his prayer for injunctive relief is moot. *Loertscher v. Anderson*, 893 F.3d 386, 394–96 (7th Cir. 2018); *Ford v. County of Winnebago*, No. 3:19-cv-50056, 2022 U.S. Dist. LEXIS 10469, at *13 (N.D. Ill. Jan. 20, 2022); *Bernard v. Scott*, 501 F. Supp. 3d 611, 629–30 (N.D. Ill. 2020). Though his prayer for relief might not be moot if he is likely to be transferred back to the Jail, *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996), Osterberg has not responded to Defendants' mootness argument and the record is void of any evidence to establish

that he is likely to return. Thus, the Court dismisses Osterberg's claims for injunctive relief.

### III. Conclusion

For the foregoing reasons, Defendants motion for summary judgment [115] is granted. Civil case terminated.

Date: June 27, 2022

_____
Honorable Iain D. Johnston
United States District Judge